[No. 23811-6-I.   Division One.   May 29, 1990.]

ROCKE J. SAUTER, *Appellant,* v. MOUNT VERNON SCHOOL DISTRICT NO. 320, *Respondent.*

*Mitchell Cogdill, Kent Millikan,* and *Cogdill, Deno, Millikan & Carter,* for appellant.

*Valerie L. Hughes, Charles N. Eberhardt,* and *Perkins Coie,* for respondent.

COLEMAN, C.J.—Rocke Sauter appeals from the trial court's judgment affirming his discharge by the Mount Vernon School District. We affirm.

Sauter was a math teacher at Mount Vernon High School. On October 10, 1986, the superintendent of the Mount Vernon School District notified Sauter by letter that he had found "probable cause for your discharge as a certificated employee of the District." The letter stated:

> The cause for my determination is your patently unacceptable, unprofessional, and immoral conduct in relation to [J], a District student and a minor. As demonstrated by your handwritten note delivered to [J] last month, you have engaged in sexually exploitive conduct toward [J]. The note—itself highly suggestive and totally unprofessional—was delivered by you in the context of a dialogue concerning a potential liaison and sexual relationship between yourself and [J]. By your written

admission of last month, you acknowledged that such a dialogue did in fact occur. It was you who solicited her for a sexual relationship, according to [J]. The sexual dialogue occurred in the context of proposals by you for private get–togethers of yourself and [J].

So far as we know at this time, you did not succeed in seducing [J]; but your reprehensible and predatory conduct toward [J] plainly is inherently destructive to [J] and to the student–teacher relationship and constitutes a material breach of your duties and obligations as a teacher. Your conduct has a material and substantual [*sic*] adverse effect on your fitness to teach and lacks any positive educational aspect or legitimate professional purpose. Further, your conduct materially and adversely detracts from your teacher–teacher, teacher–administrator, and teacher–community/parent relationships.

Upon receipt of the letter from the superintendent, Sauter requested a hearing. After an extensive hearing before a hearing officer, findings of fact and conclusions of law were entered. The findings of fact can be summarized as follows.

Rocke Sauter began teaching at Mount Vernon High School in 1985. Prior to that time, he taught math and coached sports at a middle school in the Mount Vernon School District since 1971. During the 1985–86 school year, Sauter taught algebra. J was one of his students. During that year, Sauter and J had daily contact and many conversations together. She expressed concern over some surgery she needed. Sauter was genuinely concerned on her behalf, however nothing unusual happened in the relationship between the two during that school year.

During the summer of 1986 Sauter rode his bicycle daily. On one occasion he rode past J's residence and stopped in to see her. He was curious as to how she was doing and if she had completed her surgery. They took a bike ride together, and at one point they stopped to rest, during which time they had an extensive conversation. Sauter told J that he thought she was very attractive and was pretty enough to be a model. He told her that he had seen her in her apartment when he had ridden by her house before. He told her that he was glad he had taught at a middle school for so many years because he did not know if he could handle "the girl situation" in high school when he was younger.

When the 1986–87 school year began, J dropped by Sauter's office on a regular basis, during which time they discussed many of her personal problems. At one point she told Sauter she would like to make love to him. During these conversations, Sauter confided in J that he was having difficulty with his marriage and that his wife might be going to California. Sauter told J that he found her very attractive, that he had had a vasectomy, and that he wanted to make love with her too. Both expressed reasons why this potential relationship should not take place, but their discussions continued.

On September 19, 1986, Sauter wrote a note to J during his second period class which he gave to her immediately after second period. The note was not addressed, dated, or signed. The note read as follows:

> I wrote you a letter at 2:22 last night—I couldn't sleep—A little war was going on inside me. One part of me was saying "forget her—time will take care of things." Another was saying "she is *beautiful*, stimulating, sensational and can make you feel so alive. Go for it."
>
> What I wrote last night depicted a little scene between us. A fantasy of an encounter. I must admit I liked what I thought about, and I planned to give you the note—It was full of feeling and emotion—but I chickened out—After reading it this morning I couldn't go through with it—I was too embarrassed to have you read about my fantasy with you—I am in a difficult situation—I want you to be around and yet I don't trust myself to keep it at a friendly level—and yet I must—The temptation is so great—But let's just play it cool—come and see me—I do want you to come around—we can talk, share our thoughts and just see how time affects us—Sorry I missed you this morning.

When Sauter gave J the note, he told her to "rip it up and don't let anyone see it."

J subsequently brought the note to the attention of school authorities. A few days after J turned the note in and J's written and oral statements concerning the incidents with Sauter were taken, Sauter prepared a written statement which he delivered to the school authorities outlining his interpretation of the note and his reply to the

accusations made by J of previous sexual advances. Sauter's statement is as follows:

To the best of my recollection, Monday or Tuesday, the week of the 15–20 of September, [J] was in my office upon my return from my third period class. I could tell that she was upset. I didn't ask her if she had a class. I assumed she was on lunch. I was on lunch/prep so we talked. She related to me that things were pressing in on her at home. Her boyfriend lived with them and she wasn't comfortable with that arrangement. She also said they would be moving soon and he would be moving out at that time. I listened and told her that just give it some time, when he moved things would look better, that what they probably needed was some space of their own. She talked some more about her situation relative to her boyfriend and finally she brought up the subject that she was attracted to me. She stated "I want you" or something to that effect. She asked me if I had a desire to make love to her. This did catch me off guard. I said: 1. If I weren't married; 2. Not a teacher; 3. Twenty years younger, sure, but I proceeded to explain about the trust society puts in teachers, the significance of my feelings about marriage and the fact that I was old enough to be her father. I tried to be as delicate about the whole thing, thinking that I didn't want to make her feel terribly rejected after she had taken the risk of revealing her feelings to me, but at the same time establishing the fact that there was no way that we would ever have anything but a student/teacher friendship. I left it at that and felt there was no need for further action. I didn't find out that she was supposed to be in French until the bell for end of lunch rang and I asked her where she was supposed to go. She told me she was skipping French and had second lunch. When we parted she seemed to feel better about her situation and asked if I could give her a note to excuse her absence. I told her I would talk to her teacher and her teacher would have to decide if the absence was excused or not.

The next day I went to first lunch and returned to my office to correct papers fourth period. [J] showed up during lunch and we engaged in conversation. She told me that her boyfriend had moved out the night before. She proceeded to converse about various matters. She again brought up the topic of having an affair. I again spelled out in no uncertain terms that I wasn't going to do anything like that. We discussed at length various facts of life relative to what she wanted to do. At each point I just reaffirmed why I would not get involved, quoting the three previously stated reasons. When this conversation ended I felt she should have no doubt of where I stood, but felt also that she wasn't uncomfortable at coming to talk to me. I

should have at this time reported the incident to the counselor, but felt there was no need to.

[J] didn't come by at lunch any more that week, but did come by in the morning. She again engaged me in conversation about person's desires, etc. I really don't remember the entire conversation or which morning it was, but I do recall again confirming that I liked her as a friend, would be someone for her to confide in, but that was all. As a result of this encounter, I wrote a note to her—I gave it to her later that day or the next. It again confirmed that time would take care of desires felt and that she could come and talk, but that was all.

I saw [J] at the game Friday. She informed me that she had broken up with her boyfriend and asked if my wife was with me. I told her no and she said, "let's go somewhere." I said no, but that we could talk. She was really shaken by the breakup. I told her to maintain, go to the dance and have a good time. During the game [J]'s friend Jennifer Franklin ran into me on my way to get coffee. She said [J]'s boyfriend was looking for her and wanted to beat her up. After the game I dropped in on the dance and helped out. When I left the dance, I saw [J] and Jennifer outside. [J] walked to my truck with me. She was still upset about breaking up with her boyfriend. I simply told her to just take it easy, go and spend the night with Jennifer, stay out of trouble and to take care of herself.

Monday morning before first period, I was in my office. I had felt that everything had probably blown over by now. [J] came by again and said that she couldn't go through with it if it came down to having an affair and I couldn't either. I confirmed her statement saying that I was glad she had finally gotten the message and that she really needed to be cautious because you can't ever tell how someone will react.

On October 6, 1986, Sauter was suspended with pay.

On July 1, 1987, based upon these facts, the hearing officer concluded that the District had sufficient cause to discharge Sauter and affirmed his discharge. The District then discontinued Sauter's pay and withheld his last two monthly paychecks for July and August 1987. Sauter appealed to the Superior Court where the hearing officer's decision was affirmed on February 23, 1989. The trial court also affirmed the District's discontinuance of Sauter's salary. This appeal followed.

Appellant contends that (1) there was insufficient evidence to support his discharge, (2) the trial court erred by affirming the order of the hearing officer denying his

motion to depose a witness, and (3) the trial court erred by affirming the District's discontinuance of his salary.

██ Whether appellant actually engaged in certain conduct or was deficient in his practices or methods clearly is a factual question. *Clarke v. Shoreline Sch. Dist. 412,* 106 Wn.2d 102, 110, 720 P.2d 793 (1986). Thus, this court will not disturb the hearing officer's findings of fact on such matters unless they are clearly erroneous. *Clarke,* at 102. However, whether appellant's conduct, practices, or methods constitute "sufficient cause" for his discharge under RCW 28A.58.099(1) is a question of law. This court reviews such issues de novo, "meaning the reviewing court determines the correct law and applies it to the facts as found by the hearing officer." *Clarke,* at 110.

In the instant case, the hearing officer gave the following reasons for discharge:

A. Mr. Sauter is in a unique position of trust with regard to the students in his care. He has materially and substantially breached this trust with regard to [J], a student in the Mount Vernon School District. He further misrepresented his intent with regard to the note he wrote to [J] at the hearing held on this matter and in the statement given to Mr. Ellis on September 29, 1986.

B. While there is no doubt in this hearing officer's mind that Mr. Sauter would not repeat such an incident, he was well aware that he exceeded the bounds of his employment and his duty as a teacher in the discussions he had with [J] and the note he wrote to her. Mr. Sauter's attempted seduction of [J] took place during school hours with a student who had developed a special relationship with her teacher as a former teaching assistant. The student was especially vulnerable, having had a history of sexual abuse in her past and ongoing medical and emotional problems.

C. The Mount Vernon School District should not have to tolerate the attempted seduction of its students by teachers trusted to educate the students.

D. Mr. Sauter's conduct is not remediable in the eyes of the school administration, the school board and the community at large, which works with the school district. Mr. Pollino and Mr. Watson would not have served such a long tenure in their positions if they did not have the support of the community, which is composed of citizens who support the system and parents who send their students to the Mount Vernon School District to be educated.

E. Students and teachers might be more forgiving but Mr. Sauter's employers are not and they are ultimately responsible for insuring the education of the students in the system. Mr. Sauter's conduct towards [J] has no legitimate teaching purpose and is inherently harmful to the student/teacher relationship.

Appellant challenges many of the findings in support of these conclusions, alleging that they were not proven by a preponderance of the evidence. We disagree.

J's testimony supports the findings with respect to the statements appellant made to J on the day they rode their bicycles together, the statements appellant made to her about his marriage being in trouble, that he found her attractive, that he had had a vasectomy, and that he wanted to make love to her. In his testimony, appellant did not deny that he had had a vasectomy or that his wife was leaving for California. Appellant testified that he found J attractive, beautiful, stimulating, and that he was tempted to have sex with her.

█ The hearing officer's finding that appellant's explanation of the note was not credible is entitled to great deference. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 330, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983). Moreover, the circumstances leading up to the note and the language of the note itself support the hearing examiner's finding. Appellant contends that the note should be read in the context of his repeated attempts to explain why they should not get involved in a sexual relationship; however, the note does not contain any reasons to this effect. The note provides ample grounds for the hearing officer's finding that appellant was laying the groundwork for pursuing a sexual relationship with J. In fact, J testified that after receiving the note, she believed that appellant was serious about wanting to make love to her. The hearing officer also had before him the testimony of three Mount Vernon High School teachers who all found the note improper, offensive, and disturbing.

There was also sufficient evidence in the record through the testimony of the principal, assistant principal, superintendent of the Mount Vernon School District, and a member of the Mount Vernon School Board, to support the hearing officer's findings that the administration had lost trust in appellant's ability to deal with students, that the community would be outraged if appellant returned to the classroom,[1] and that the administration would feel compelled to keep a close eye on appellant and his activities if he did return to the classroom.

After reviewing the record, it is clear that the hearing officer's findings of fact are supported by substantial evidence and are not clearly erroneous. *See Clarke,* at 112.

We next determine de novo whether these facts were sufficient cause for appellant's discharge. RCW 28A.58-.099(1) is applicable. It provides:

> **Hiring and discharging of employees—.** . . Every board of directors, unless otherwise specially provided by law, shall:
> (1) Employ for not more than one year, and for sufficient cause discharge all certificated and noncertificated employees[.]

Although "sufficient cause" for discharge is not defined in the statute, the general rule in Washington is that sufficient cause for discharge exists as a matter of law where the teacher's deficiency is unremediable and (1) materially and substantially affects performance, *Hoagland v. Mount Vernon Sch. Dist. 320,* 95 Wn.2d 424, 428, 623 P.2d 1156 (1981), or (2) where the teacher's conduct lacks any positive educational aspect or legitimate professional purpose. *See Clarke,* at 113–14. *Pryse v. Yakima Sch. Dist. 7,* 30 Wn. App. 16, 24, 632 P.2d 60 (sexually suggestive comments and actions directed toward female students), *review denied,* 96 Wn.2d 1011 (1981); *Potter v. Kalama Pub. Sch. Dist. 402,* 31 Wn. App. 838, 842, 644 P.2d 1229 (1982) (improper physical contact with female students). Because of the

---

[1]The principal of Mount Vernon High School testified that he had a number of parents of students in the school district ask him about the sexual allegations against appellant.

insertion of the subdivisions by the *Clarke* court, a strict grammatical interpretation of this rule could result in applying the remediable requirement to both subdivisions. However, based upon *Pryse* and *Potter,* we conclude that the *Clarke* court did not intend remediability to apply to both subdivisions (1) and (2). Rather, we conclude that remediability only applies to subdivision (1). In light of this interpretation, the test should read that sufficient cause for discharge exists as a matter of law where the teacher's deficiency is unremediable and materially and substantially affects performance *or* where the teacher's conduct lacks any positive educational aspect or legitimate professional purpose. By inserting "or" the court in *Clarke v. Shoreline Sch. Dist. 412,* 106 Wn.2d 102, 720 P.2d 793 (1986) is indicating an alternative test. For example, in *Pryse* and *Potter,* the teacher's conduct was so egregious that it did not matter whether the conduct was remediable. *See also Mott v. Endicott Sch. Dist. 308,* 105 Wn.2d 199, 713 P.2d 98 (1986) (Mott's repeated striking of his students in the genitals lacked any positive educational aspect or legitimate professional purpose and therefore constituted sufficient cause for discharge regardless of Mott's argument that his conduct was a remediable teaching deficiency). Such is the situation here.

In the instant case, appellant contends, relying on *Hoagland,* that his alleged misconduct was outside the scope of his classroom teaching duties and did not materially and substantially impair the effectiveness of his teaching duties. Therefore, appellant contends that his conduct did not amount to sufficient cause for discharge.

The Supreme Court in *Hoagland* set out eight factors for consideration in teacher discharge cases. In determining whether a teacher's conduct substantially undermines his effectiveness, thereby justifying his discharge, the court stated that it would consider the propriety of dismissal in light of:

(1) the age and maturity of the students; (2) the likelihood the teacher's conduct will have adversely affected students or other

teachers; (3) the degree of the anticipated adversity; (4) the proximity or remoteness in time of the conduct; (5) the extenuating or aggravating circumstances surrounding the conduct; (6) the likelihood that the conduct may be repeated; (7) the motives underlying the conduct; and (8) whether the conduct will have a chilling effect on the rights of the teachers . . ..

*Hoagland,* at 429–30. However, the court later stated in *Clarke* that (1) "not all eight factors will be applicable in every teacher discharge case[,]" and (2) "these factors are not necessarily applicable when the cause for dismissal is the teacher's improper performance of his duties." *Clarke,* at 114. "They were designed to ensure that 'when a teacher's status or conduct outside his profession is the basis for his dismissal, that cause is related to his performance of his duties as a teacher'." *Clarke,* at 114–15 (quoting *Simmons v. Vancouver Sch. Dist. 37,* 41 Wn. App. 365, 378, 704 P.2d 648, *review denied,* 104 Wn.2d 1018 (1985).

▪ In the instant case, we are not faced with conduct involving a teacher's private life unrelated to school activities. *See Pryse,* at 23–24. Appellant's conduct was sexually exploitive and was directly related to his conduct as a teacher. Thus, the *Hoagland* factors are inapplicable in the instant case. However, the second test set forth in *Clarke* is applicable. As in *Pryse* and *Potter,* appellant's conduct here did not have any positive educational aspect or legitimate professional purpose. Therefore, there was sufficient cause for appellant's discharge as a matter of law. The fact that the misconduct may not occur again or that the person engaging in the misconduct may possess excellent teaching skills is irrelevant. The second test set forth in *Clarke* refers to conduct which by its very nature affects one's fitness to teach and, therefore, it is not necessary to focus on classroom deficiencies. The hearing officer's conclusion that the facts in the instant case were sufficient cause to warrant discharge is clearly supported by the record.

We next consider whether the trial court erred by affirming the order of the hearing officer denying appellant's motion to depose J's psychologist. The hearing officer ruled that (1) the information sought was privileged under RCW

18.83.110,[2] (2) there had been no waiver of the privilege by J, and (3) this case was not an exception to the psychologist/patient privilege provisions. Appellant concedes that communications from J's counseling sessions with her psychologist are privileged, but argues that they fall within the child abuse reporting exception to the psychologist/patient privilege.

The Washington Legislature has enacted a limited exception to the psychologist/patient privilege in the child abuse reporting provisions of RCW 26.44. Under that chapter, a psychologist has an affirmative duty to report incidents of child abuse or neglect to a law enforcement agency or to the Department of Social and Health Services. RCW 26.44.030(1). A psychologist complying with this duty does not violate the psychologist/patient privilege. RCW 26.44-.060(3).

██ The purpose of the exception is to "prevent further abuses, and to safeguard the general welfare of [abused and neglected] children . . .". RCW 26.44.010. The exception cannot be used by the accused in order to discredit the victim. Moreover, contrary to appellant's contention, the privilege was not waived when J's psychological or emotional state was placed in issue. The privilege was J's, and only she, by her own affirmative conduct, could waive it. *See* E. Cleary, *McCormick on Evidence* § 102, at 252 (3d ed. 1984). In the instant case, this was not done. Thus, the hearing officer properly denied appellant's motion to depose J's psychologist.

Finally, we consider whether the trial court erred by affirming the District's discontinuance of appellant's salary after the hearing officer affirmed his discharge. Appellant contends that he is entitled to recover from the District whether or not he prevails on appeal the 2 months' salary

---

[2] RCW 18.83.110 provides: "Confidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client[.]"

which it withheld after the hearing officer affirmed his discharge. Appellant contends, relying on the collective bargaining agreement, that because he was available and willing to work for the entire school year, he is entitled to receive full salary for the 1986–87 school year. We disagree.

■ Appellant's teaching contract does not provide support for this argument. It merely provides that he shall perform his professional services "for one year" and that his salary, to be paid in 12 monthly installments, is "annual". Since appellant's contract does not address the issue of compensation in the event of termination, pursuant to RCW 28A.58.098(2), appellant's compensation is to be "reasonable based on the proportion of the uncompleted contract". The District complied with this provision. Appellant's compensation was reasonable based upon the proportion of the completed contract. Appellant was compensated for 10 months of his annual salary for only having taught 21 days and 78 hours of coaching.

The District paid appellant his monthly salary preceding the hearing officer's affirmance of his discharge. Under these circumstances, appellant was protected in the event that the hearing officer determined that the District's decision was erroneous. To hold that appellant is also entitled to his salary for the period after his discharge was affirmed would result in appellant receiving a windfall. Thus, we conclude that the trial court did not err by affirming the District's discontinuance of appellant's salary after the hearing officer affirmed his discharge.

The judgment of the trial court is affirmed.

PEKELIS and FORREST, JJ., concur.

After modification, further reconsideration denied August 8, 1990.