[No. 32808-5-I.    Division One.    May 2, 1994.]

J.N., *Appellant*, v. BELLINGHAM SCHOOL DISTRICT NO. 501, ET AL, *Respondents*.

*Douglas R. Shepherd* and *Shepherd, Abbott & Woodall,* for appellant.

*Michael A. Patterson* and *Lee, Smart, Cook, Martin & Patterson, P.S., Inc.; John T. Slater,* for respondents.

PEKELIS, A.C.J. — This action arises out of a series of sexual assaults upon J.N. allegedly committed by A.B. Both were students at Geneva Elementary School in the Bellingham School District (District). J.N. appeals the trial court's dismissal of his negligent supervision claim against the District, contending that evidence of the District's knowledge of A.B.'s dangerous propensities precluded summary judgment on the issue of foreseeability of the sexual assaults. He also challenges the trial court's refusal to compel discovery of A.B.'s psychological assessment records possessed by the District. We reverse on both issues and remand for trial.

# I

## FACTS

### A. Overview.

A.B., age 9, enrolled in Geneva Elementary School as a fourth grade student in November 1989.[1] J.N., then 7 years old, was a first grade student at the school.

Owing to changes in J.N.'s demeanor and appearance in mid-April 1990, J.N.'s teacher, Julie Batten, suspected that J.N. might be the victim of abuse, and she contacted Child Protective Services. Subsequently, J.N. disclosed that he had been sexually assaulted by A.B. in the boys' rest room during recess periods.[2] After learning of the allegations of assaults by A.B. upon J.N., the school principal, Robert Austin, during a telephone call with a school social worker, stated that he had "been concerned re: 4th gr[ader] [A.B.] all yr". A.B. was subsequently expelled from Geneva.

### B. A.B.'s Behavior Problems at Geneva Elementary School.

During the 1989-90 school year, Geneva personnel documented numerous instances of A.B.'s aggressive and disruptive behavior in school. According to A.B.'s fourth grade teacher, Jean Sigmar, he was "a child that had problems at the very beginning, but they increased". A.B.'s third grade teacher had advised Sigmar that A.B. "was a kid he was concerned about, that his behavior had gotten worse towards the end of the year. He just thought he was a student I should watch." Sigmar characterized this behavior as "very bothersome, annoying . . . [and] disruptive".

After speaking with A.B.'s mother, Sigmar wrote her a letter in January 1990 stating "I think we need to pursue the possibility A.B. may be A.D.D. (Attention Deficit Disorder) and need medical help." Sigmar advised Mrs. B. that

---

[1]A.B. had attended Geneva as a third grade student during the 1988-89 school year. For reasons that are not clear from the record, A.B. attended school elsewhere during the first 3 months of the fourth grade.

[2]Specifically, J.N. testified that A.B. forced him, at knifepoint, from the playground into the boys' rest room inside of the cafeteria. In the rest room stall, A.B. allegedly "put his mouth on [J.N.'s] private part", and on other occasions "he would stick stuff in [J.N.'s] butt".

four other Geneva staff members had reported similar " 'out of control' behavior" and that

> [t]here is definitely an escalation of misbehaviors, stemming from A.B.'s lack of self control. . . . He is extremely physically active, and very spontaneous orally. He is easily fixated in a behavior and needs outside help to desist. He does do better in a very structured situation but this week even that has not made much difference.

In January, Geneva hired Cindy Sky Wohanna to work with several students in a "social skills group" intended to improve the behavior of problem students. Her group, which included A.B., comprised "eight boys, all of whom were significant behavioral problems". According to Wohanna,

> A.B. seemed to be a really strong catalyst for acting out. His presence seemed to aggravate the group even more . . ..
>
> . . . .
>
> . . . He was a catalyst. A number of the quieter boys began wearing their coats to group. . . . I saw that as fear. That was an interpretation on my part that they were fearful. They asked that A.B. not be in the group.

After speaking with A.B.'s mother, Wohanna believed there was a "family history here of sexual abuse" and began to suspect that A.B. had experienced "some kind of trauma"; she discussed these concerns with Jean Sigmar and Geneva's principal, Robert Austin.

In February and March, Geneva personnel commenced observation of A.B., considering him a "Focus of Concern". Principal Austin observed A.B. during social studies, reporting that he engaged in continuous irritating behaviors directed at other students, including hair-pulling, hitting another student on the head with a pencil, poking another student in the back with his foot, and shoving another student off a chair. Austin concluded his observations as follows: "At no time during the entire period that I observed A.B. did he appear to be on task as the rest of the class was." A special education teacher observed A.B. during gym class and reported that he was "physically aggressive towards his peers a total [of] 13 times. This was seen as kicking (3) hitting (6) body butting (3) and pushing (1)."

On March 1, in answering the question "What is the problem" on a report concerning A.B., Sigmar wrote as follows:

> [A.B.]'s behavior seems out of control. . . . He is constantly moving and bothering others with verbal teasing, making faces, pulling hair, poking, kicking, leaning on, etc.
>
> . . . Even the best, most patient kids ask me privately if they have to work with him.
>
> . . . He is totally disruptive in cooperative learning situations and group work activities. He has very poor attention skills.

On March 8, Austin wrote to A.B.'s mother, explaining that A.B. had been brought to his attention as a "Focus of Concern" because of his "Behavior in classrooms, PE, and recess". Pursuant to the determination of the Bellingham School District's Special Services Department, Austin requested Mrs. B.'s permission to conduct a special education assessment by a "multidisciplinary team" (MDT), including testing by a school psychologist, to determine if A.B. "has a handicapping condition". Mrs. B. gave this permission on March 15.

As part of this assessment, Jean Sigmar completed a teacher's report form, which reiterated prior concerns about A.B.'s behavior. Specifically, Sigmar reported that A.B. did not usually follow rules, did not have acceptable peer relations, had a problem engaging in socially appropriate conversation ("Language is sometimes sexual in nature"), and that he "has had difficulty everywhere he goes — P.E., Music, Library, Lunchroom, Playground".

Psychological testing was performed by Jeremiah Schwartz, Ph.D., school psychologist. On April 20, Schwartz, the MDT leader, prepared a "Special Services Assessment Summary", which determined A.B. had a handicapping condition termed "SBD" (severely behaviorally disabled). A.B. was deemed in need of an individualized education program and declared eligible for special education. Principal Austin sent Mrs. B. a copy of the summary on May 21.

C. Supervision at Geneva Elementary School During Recess.

Geneva had approximately 350 students in grades kindergarten through five. Under Geneva's 1989-90 "bell schedule", students in kindergarten through second grade would take lunch recess from 11:45 a.m. until 12:30 p.m. At 12:15 lunch recess would commence for grades three through five. It is thus undisputed that there were 15 minutes during the day when 350 students were simultaneously released for recess. It is also undisputed that during these 15 minutes A.B. and J.N. could possibly have been on the playground at the same time. There was also evidence that during some part of the school year, A.B. had served as a "line leader" for J.N.'s class. Under Geneva's "line leader" system, older students would lead classes of younger students to and from some recess periods.

Geneva had one playground supervisor, Pat Davis, an "instructional assistant". Additionally, during recess there were "at least three other adults . . . supervising the lunch room". Pat Davis believed A.B. to be a discipline problem owing to his aggressive behavior on the playground, including "[t]ouching kids, grabbing kids, bugging kids, [and] hitting kids".

D. Proceedings Below.

A lawsuit against the District was filed by J.N. through a guardian ad litem, alleging that J.N. had been sexually assaulted on schoolgrounds by A.B. throughout the school year. The complaint asserted a cause of action for negligent supervision over the students during school hours.

During discovery, Plaintiff sought production of all records produced or maintained by the District or in the possession of the District that referred to A.B. After a series of objections, motions to compel, and an order that such records be produced, the District continued to withhold the special services assessment pertaining to A.B. In response to a motion to compel production, the District claimed the assessment was a "Psychologist's Report" privileged under RCW 18.83.110. Finding that the psychological evaluation

was "privileged by Patient/Psychologist Privilege", the trial court initially denied Plaintiff's motion and refused to order production of the assessment.

Upon Plaintiff's motion for reconsideration, however, the trial court ordered production of the assessment summary and attachments, but excepted from disclosure "the psychological assessment by Dr. Jeremiah Schwartz and the psychological tests on [A.B.]".[3] Pursuant to this order, the District produced a redacted version of the summary and attachments. The withheld portion was given to the trial court for review and was subsequently ordered sealed.

The District moved for summary judgment and dismissal of J.N.'s complaint, submitting the affidavits of "educational professionals and school district attorneys from Western Washington", who averred that they had never heard of a sexual assault between two elementary school students. The District asserted that because school personnel had no information to suggest that A.B. "could or would commit a sexual assault", J.N. could not establish any negligence.

In opposition to the motion, J.N. submitted (inter alia) the testimony of two experts. By affidavit, Marsha Thatcher, a clinical psychologist, stated that in her professional opinion

> the combination [of] facts known by the school prior to the [April 20 Special Services Assessment] . . . clearly indicate that . . . [A.B.] needed to be closely monitored on school grounds. After the Special Services Assessment was completed there was overwhelming evidence known to school personnel that made it foreseeable that [A.B.] had the potential to be both assaulting and aggressive towards another student. That [A.B.'s] assaulting behavior could take the form of sexual molest was indicated by a combination of factors [known to the District]. . . .

Toni Cavanagh Johnson, also a clinical psychologist, opined that "[A.B.] posed an identifiable threat to commit a violent assault upon other children at Geneva Elementary School and that due to their inattention to [A.B.]'s needs and

---

[3]In its oral opinion, the trial court explained that any documentation of psychological tests performed on A.B. by Schwartz "in the traditional psychological framework" would be subject to the privilege, as well as Schwartz's "independent professional evaluation".

escalating assaultive behavior, those responsible for supervising [A.B.] were negligent in their duty to protect the other students".

The trial court granted the District's motion for summary judgment, reasoning as follows:

> The overall evidence is that you had a hyperactive kid, and I would just have to assume that this happens all the time. . . . [A]ttention deficit disorder is probably what he had, hyperactive poking at kids. [Plaintiff's counsel] referred to that as "assaultive behavior"; that's fine. And I agree to a certain extent that may be assaultive behavior, but that's not the kind of assault that took place here.
>
> The school had no knowledge; they had no indication; there was nothing to indicate that he had ever displayed any violent or assaultive behavior, particularly the type of assault that took place against [J.N.]. He was never at any point considered to be a danger to other students.
>
> Now, the experts differ as to . . . "hindsight." We can say all different things. I cannot at any time say that the destructive behavior [A.B.] committed could very well or even at a minimum be equated to the type of assault that took place here.
>
> . . . .
>
> [T]here was no evidence at all, no knowledge on the part of the school at all, that he was dangerous, that he would commit this type of a violent sexual attack. The conclusions of plaintiff's experts doesn't [sic] rise to the same thing.

Accordingly, on April 23, 1993, the court entered an order dismissing J.N.'s complaint.

J.N. appeals both the order of summary judgment and the order denying his request for production of the psychological assessment.

## II

### FORESEEABILITY

J.N. contends that the evidence adduced in opposition to the District's motion sufficed to create a jury question as to whether the sexual assault on him should reasonably have been anticipated by the school district. The District argues that a sexual assault was beyond the scope of what it reasonably should have anticipated based on A.B.'s prior conduct.

■ It is undisputed that the District had a duty to protect the pupils in its custody from dangers reasonably to be

anticipated. Under well-established principles, when a pupil attends a school, he or she is subject to the rules and discipline of the school, and the protective custody of the teachers is substituted for that of the parent. *McLeod v. Grant Cy. Sch. Dist. 128*, 42 Wn.2d 316, 319-20, 255 P.2d 360 (1953). The duty imposed under these circumstances is one of reasonable care: as it supervises the pupils within its custody, the district is required to exercise such care as a reasonably prudent person would exercise under the same or similar circumstances. *Briscoe v. School Dist. 123*, 32 Wn.2d 353, 362, 201 P.2d 697 (1949); *McLeod*, 42 Wn.2d at 319-20 (liability of school district is to be determined according to the normal rules of tort law). "The basic idea is that a school district has the power to control the conduct of its students while they are in school or engaged in school activities, and with that power goes the responsibility of reasonable supervision." *Peck v. Siau*, 65 Wn. App. 285, 292, 827 P.2d 1108, *review denied*, 120 Wn.2d 1005 (1992).

■ However, the duty to use reasonable care only extends to such risks of harm as are foreseeable. *See, e.g., Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982). Thus, "[t]he concept of foreseeability limits the scope of the duty owed." *Christen v. Lee*, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989); *see also Hansen v. Friend*, 118 Wn.2d 476, 483, 824 P.2d 483 (1992); 16 David K. DeWolf & Keller W. Allen, Wash. Prac., *Tort Law and Practice* § 1.14 (1993). In order to establish foreseeability, "the harm sustained must be reasonably perceived as being within the general field of danger covered by the specific duty owed by the defendant." *Maltman v. Sauer*, 84 Wn.2d 975, 981, 530 P.2d 254 (1975). Whether the general field of danger should have been anticipated by defendant is normally an issue for the jury; it can be decided as a matter of law only where reasonable minds cannot differ. *Christen*, 113 Wn.2d at 492; *Rikstad v. Holmberg*, 76 Wn.2d 265, 270, 456 P.2d 355 (1969).

In *Peck v. Siau, supra*, the Court of Appeals described the scope of a school district's duty as follows:

A school district's duty requires that it exercise reasonable care to protect students from physical hazards in the school building or on school grounds. [I]t also requires that the district exercise reasonable care to protect students from the harmful actions of fellow students, a teacher, or other third persons. However, the district is not liable merely because such activities occur. Rather, *the district will be liable only if the wrongful activities are foreseeable, and the activities will be foreseeable only if the district knew or in the exercise of reasonable care should have known of the risk that resulted in their occurrence.*

(Citations omitted. Italics ours.) 65 Wn. App. at 293.

The District insists that it had no information to suggest that A.B. might commit a criminal or sexual assault. This argument misperceives the legal question, however. In similar circumstances, the issue of foreseeability was addressed by our Supreme Court in *McLeod v. Grant Cy. Sch. Dist. 128,* supra. In *McLeod,* plaintiff was forcibly raped by fellow students during a noon recess in the school gymnasium. The rape occurred in a dark, unlocked room adjoining the gymnasium, and on the day of the incident the students were unsupervised during recess. The trial court dismissed plaintiff's complaint.

The Supreme Court reversed. According to the *McLeod* majority, the fact that the harm was caused by an intervening intentional criminal act did not "of itself exonerate a defendant from negligence". 42 Wn.2d at 320. Rather, it was "a fact to be considered in determining whether such act was reasonably foreseeable." 42 Wn.2d at 321; *see also Christen,* 113 Wn.2d at 492 (whether an intervening act is criminal in nature bears on whether the act was foreseeable, but it does not necessarily preclude a finding of foreseeability). The majority explained that

counsel unjustifiably restrict the issue when they ask us to focus attention upon the specific type of incident which here occurred — forcible rape. . . . *[T]he pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated.*

(Italics ours.) 42 Wn.2d at 321; *see also Rikstad,* 76 Wn.2d at 269 ("It is not . . . the unusualness of the act that resulted in

injury to plaintiff that is the test of foreseeability, but whether the result of the act is within the ambit of the hazards covered by the duty imposed upon the defendant.").

Based on the allegations of plaintiff's complaint, the *Mc-Cleod* court defined the general field of danger as follows: "that the darkened room under the bleachers might be utilized during periods of unsupervised play for acts of indecency between school boys and girls." 42 Wn.2d at 322. The court ruled that there was "room for a reasonable difference of opinion as to whether the school district should reasonably have anticipated that the darkened room might be used for acts of indecency", and declined to say that "it is highly extraordinary that the room was actually used for such acts." 42 Wn.2d at 323-24. Thus, the court held that the question of whether the danger was one which should have been reasonably anticipated by the school district was one for the jury to decide.

In *McLeod*, the general field of danger flowed from the existence of an accessible darkened room coupled with a lack of supervision. Even in the absence of any evidence of the "vicious propensities" of the assailants, those specific facts put the school on notice of a *risk* of indecent acts; the particular harm (rape) fell within that risk.

█ Here, the general field of danger — harm to a pupil caused by another pupil — flowed from the arguably inadequate recess supervision and the presence of nearby, accessible, and generally unsupervised rest rooms.[4] It is irrelevant to the inquiry on summary judgment that the particular injury that in fact occurred was a criminal assault or that it was sexual in nature. All that is required is evidence that the District knew or in the exercise of reasonable care should have known of *the risk* that resulted in the harm's

---

[4]The District attempts to distinguish *McLeod* on the grounds that in that case there was no supervision whatsoever. We reject the District's argument that evidence of *some* supervision precludes a determination that the District breached its duty of care. The fact that a playground supervisor was in fact present may well constitute evidence of adequate supervision, but we certainly cannot say that the presence of one supervisor on a playground with 350 students is adequate supervision as a matter of law, or that no reasonable juror could conclude that the incident would have been prevented with increased supervision.

occurrence. *Peck*, at 293. We conclude that in this case, a jury could reasonably conclude that A.B.'s actions fell within the general ambit of hazards which should have been anticipated by the District.

Moreover, here there was evidence that the school district had notice of A.B.'s assaultive propensity. Thus, the District's reliance on *Peck v. Siau, supra*, is misplaced. In that case, a student sued the school district for negligent supervision of a school teacher who had engaged in sexual relations with the student on schoolgrounds. The court upheld a summary judgment in favor of the school district on the grounds that plaintiff had produced no evidence that the district knew or in the exercise of reasonable care should have known that the teacher was a risk to the students. 65 Wn. App. at 293-94.

██ ██ In this case J.N. submitted overwhelming evidence of notice to the District of A.B.'s prior actions demonstrating a propensity to assault other students. Thus, even assuming that the harm was outside of the "general field of danger" that the District should have anticipated, summary judgment was still inappropriate because there was sufficient evidence that the District had notice of the possibility of the specific harm inflicted. *See Christen v. Lee*, 113 Wn.2d at 498 (although criminal assault is not a foreseeable result of furnishing liquor to an obviously intoxicated person, tavern liable if it had notice of the possibility of such harm). Clearly, where the disturbed, aggressive nature of a child is known to school authorities, proper supervision requires the taking of specific, appropriate procedures for the protection of other children from the potential for harm caused by such behavior.

The trial court mistakenly focused on the fact that A.B.'s prior behavior had never manifested itself as a sexual assault upon another student. It is true that evidence of a person's antisocial, unruly, or hostile behavior is generally insufficient to establish that a defendant with a supervisory duty should reasonably have anticipated a more serious misdeed. *E.g., Moore v. Mayfair Tavern, Inc.*, 75 Wn.2d 401, 405-06, 451 P.2d 669 (1969). Here, however, the trial court discounted the sworn testimony of J.N.'s experts. In general, an affidavit

containing admissible expert opinion on an ultimate issue of fact is sufficient to create a genuine issue as to that fact, precluding summary judgment. *E.g., Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 352, 588 P.2d 1346 (1979).

J.N.'s experts averred that the District had notice that the risk posed by A.B. included the risk of sexual assault. In particular, Marsha Thatcher concluded that

> there was overwhelming evidence known to school personnel that made it foreseeable that [A.B.] had the potential to be both assaulting and aggressive towards another student. That [A.B.'s] assaulting behavior could take the form of sexual molest was indicated by a combination of factors [known to the District].[5]

The District argues that Thatcher's testimony would hold the school district to the standard of a psychologist rather than the applicable reasonable person standard. The District misperceives the nature of the reasonable care inquiry, however. "Reasonable or ordinary care is that degree of care which an ordinarily careful and prudent person would exercise *under the same or similar circumstances or conditions.*" (Italics ours.) *Gordon v. Deer Park Sch. Dist. 414*, 71 Wn.2d 119, 122, 426 P.2d 824 (1967). Whether a risk of harm is reasonably foreseeable "under the same or similar circumstances" depends upon the particular defendant's characteristics and experience. *See Gordon*, 71 Wn.2d at 125 (foreseeability of injury to child during supervised baseball game on school premises evaluated in the light of instructor's "experience in playing baseball"); *see generally* W. Page Keeton et al., *Prosser and Keeton on Torts* § 32, at 175, 185 (5th ed. 1984) (persons must use all care which is consistent with particular knowledge, experience, or skills).

Thatcher's affidavit avers that it is well known that "[a]bused children frequently become abusers", and that "school personnel are trained to recognize the signs of

---

[5]Specifically, these factors comprised "Cindy Wohanna's clinical observations, the know [*sic*] history of family dysfunction, the School Psychologist's observational notes, the TRF and CBC profile [checklists completed by Mrs. B. and Jean Sigmar designed to assess a child's behavioral/emotional problems and social competence or successful adaptation], [A.B.]'s inappropriate sexual language and the fear of the other children."

abuse". Thus, she concludes that Geneva school personnel "should have recognized and acted upon the symptoms that [A.B.] presented". It is undisputed that Geneva personnel did receive training in the field of child abuse; J.N.'s evidence shows that the District instructed its staff to be observant for victims of sexual abuse, and that District literature indicated abused children frequently become offenders themselves.

We believe the jury could properly infer from this expert testimony that, in light of the school district's duty of care toward the students in its care, reasonable school personnel would have foreseen the injury to Plaintiff.

In sum, the trial court erred in concluding that J.N. failed to establish that the harm in this case was within the general field of danger imposed by the District's duty of care, and that the District could not, as a matter of law, reasonably have anticipated that A.B. would commit a sexual assault upon another student. Thus, summary judgment was improper,[6] and the trial court erred in dismissing J.N.'s claim.

## III

### PSYCHOLOGIST-PATIENT PRIVILEGE

Next, J.N. contends that the trial court erred by concluding that the records of A.B.'s evaluation by school psychologist Dr. Jeremiah Schwartz were privileged.

In Washington, a psychologist-patient privilege is established by statute:

---

[6]We reject the District's argument that summary judgment was proper because J.N. failed to submit *admissible* evidence J.N. was *repeatedly* assaulted on school grounds. The District points out that J.N.'s affidavit merely attached prior testimony produced in a criminal proceeding against A.B.

The District has not cross-appealed the denial of its motion to strike the affidavit. Thus, the argument is relevant on appeal only if, in itself, it provides an alternative basis for affirmance. The District concedes, however, that a reasonable inference from the admissible evidence is that "[J.N.] was sexually assaulted on school grounds sometime between December 1989, and June 1990." Because a jury inference of negligence could conceivably be predicated on just one incident, whenever it occurred, we cannot affirm on the ground that *some* of J.N.'s testimony was inadmissible.

Confidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client . . ..

RCW 18.83.110. The holder of the privilege is the patient, and the patient alone has the power to assert or waive the privilege. *Sauter v. Mount Vernon Sch. Dist. 320*, 58 Wn. App. 121, 133, 791 P.2d 549 (1990). The District essentially argues that although A.B.'s mother consented to dissemination of the psychological evaluation to members of the MDT special assessment team, any such waiver was limited to that purpose.[7]

■ We conclude that the psychologist-patient privilege never arose. The psychologist-patient privilege does not apply where it is manifest that the communication was not intended to be confidential. *In re Henderson*, 29 Wn. App. 748, 752, 630 P.2d 944 (1981). "[A] person may not claim a privilege as to communications that do not originate in the confidence that they will not be disclosed." *State v. Post*, 118 Wn.2d 596, 612, 826 P.2d 172, 837 P.2d 599 (1992). The psychologist-patient privilege does not arise unless the patient's intent and expectation that the communications would remain privileged is reasonable under the circumstances. *Post*, 118 Wn.2d at 612.

This case is analogous to those involving psychological examinations performed at the request of state agencies. In *Henderson*, the court held that the privilege did not apply to statements made to psychologists conducting examinations in order to provide information to the Department of Vocational Rehabilitation, and to the court, in a dependency proceeding. The court reasoned as follows:

In each case, the examinations were performed for the specific purpose of providing some third party with the results thereof.

---

[7] The MDT team comprised Principal Austin, Jean Sigmar, the school nurse, and Jeremiah Schwartz. The documents in dispute were also reviewed by the District's "Coordinator of Special Education and Programs for At-Risk Students", who signed the special services assessment summary.

Mrs. Henderson was undoubtedly aware of this purpose before the examinations took place. . . .

29 Wn. App. at 753. Accordingly, the court held that "[u]nder the circumstances of Mrs. Henderson's examinations, she could not have reasonably expected that her communications with the doctors would be kept confidential." 29 Wn. App. at 753.

Similarly, in *State v. Holland*, 30 Wn. App. 366, 635 P.2d 142 (1981), *aff'd*, 98 Wn.2d 507, 656 P.2d 1056 (1983), the court rejected the argument that a juvenile defendant's statements to a court-appointed psychologist were privileged:

> The disclosure of these communications was fully contemplated. [Defendant] did not participate for purposes of treatment or advice, but rather acted to assist the court in making its decision whether to decline jurisdiction. These were not statements made in official confidence and no privilege attaches.

30 Wn. App. at 376;[8] *accord Post*, at 613 ("[i]t is unrealistic to believe that a psychologist-patient relationship can arise by implication from a single interview" conducted for the purpose of providing a recommendation to DOC personnel supervising defendant's work release).

Here, there is no evidence whatsoever that either A.B. or his mother expected or intended that the communications with Dr. Schwartz would remain confidential. A.B. did not meet with Dr. Schwartz for the purpose of treatment or counseling. Thus, there is no basis to conclude that a psychologist-patient relationship arose between A.B. and Dr. Schwartz. Rather, the purpose of the interview was to provide a recommendation to the MDT team, which was assessing A.B.'s need for special education services.[9]

---

[8]Although the issue in *Holland* arose under the governmental information privilege, the same confidentiality analysis applies to the general psychologist-patient privilege, 5A Karl B. Tegland, Wash. Prac., *Evidence* § 185, at 80 n.5 (1989), and indeed to any evidentiary privilege, *see Post*, 118 Wn.2d at 612.

[9]The consent form signed by Mrs. B. makes this clear: it explains only that the school psychologist will administer several education tests, and it further explains that the psychological assessment will be used by the MDT team "to develop an educational program for your child". Although it was explained that no testing would be done without Mrs. B.'s permission, the permission form says nothing about confidentiality.

Because there were no confidences for the privilege to protect, the trial court erred in extending it to the records in the possession of the District. We therefore reverse the order denying J.N.'s motion to compel production. On remand, J.N. is entitled to production of the withheld documents.

GROSSE and AGID, JJ., concur.