[No. 20311-1-II.   Division Two.   February 6, 1998.]

OSCAR WILBERT, JR., *Individually and as Personal Representative*, ET AL., *Appellants*, v. METROPOLITAN PARK DISTRICT OF TACOMA, *Respondent*.

*Stephen L. Bulzomi* of *Messina Law Firm*, for appellants. *Edward S. Winskill* of *Davies Pearson, P.C.*, for respondent.

ARMSTRONG, J. — The Metropolitan Park District (Metro) rented out space to Ghetto Down Productions to put on a private dance. During the dance, Derrick Wilbert was shot and killed by two assailants. Wilbert's family (the Wilberts) sued Metro alleging theories of premises liability and voluntarily-assumed duty based on an alcohol policy of Metro. The trial court granted Metro's motion for summary judgment, finding that Metro owed no legal duty to protect Wilbert from the criminal activities of third parties. We affirm, holding that the criminal slaying was not reasonably foreseeable as a matter of law, and that any violations of Metro's alcohol policy were not a proximate cause of the killing.

Metro rented part of its South Park Community Center hall on August 29, 1992, to Ghetto Down to put on a dance. Metro had been told that the dance was to raise money for charity. On the same night, a wedding reception occupied the second room available at the facility. Metro assigned a single employee, Tom Serrano, to assist the renters with setup for their events and to monitor the events.

At the time, Metro's alcohol policy provided:

> 8. Any violation of conditions set forth by the Washington State Liquor Control Board Banquet Permit ordinance, or by the regulations and conditions of the Metropolitan Park District, will automatically and immediately terminate the rental.

In addition, the rental agreement required, as did the alcohol policy, that Ghetto Down obtain a Washington State banquet permit. The only mention of the alcohol policy in the rental agreement was an admonition to "[r]ead the additional liquor sheet carefully."

Michelle White, the bride in the wedding party that rented the second room at the facility, stated in an affidavit that numerous teenagers acted belligerently. The Ghetto

Down patrons allegedly argued, scuffled, pushed, and became very aggressive. She testified that a fight first occurred at approximately 10:30 P.M. in the hallway, and that other fights occurred during the evening. White also said the teenagers were vulgar and rowdy and blocked vehicles in the parking lot. Mrs. White's brother, Duane Demangelaere, stated in an affidavit that a fistfight occurred at 10:00 P.M. None of these disputes involved the use or threatened use of deadly force.

At approximately 12:30 A.M., a fight began. Minutes later, Derrick Wilbert was shot by two assailants. The assailants were caught and convicted of the murder.

Serrano, the Metro employee on the premises, testified during his deposition that he was unaware of any violence before the 12:30 A.M. fight. As soon as that fight began, he called 911 and requested police assistance.

The Wilberts sued Metro, alleging theories of negligence, including premises liability and the voluntary assumption of an independent duty, i.e., Metro had a duty to enforce its alcohol policy, presumably to terminate the event, and its failure to do so caused Wilbert's death. The Wilberts also asserted that because of the alcohol policy, Metro became an innkeeper and, therefore, had a duty to protect Wilbert from the harm caused by other patrons at the dance.

The Wilberts relied upon Daniel Kennedy, an expert in "security and crime prevention practices," who testified that the deadly event in question was foreseeable. Kennedy based this conclusion on the "well established theory of criminal victimization called [the] Lifestyle-Exposure Theory." This theory states that when certain "circumstances present themselves, there is a risk of personal victimization which is three to four times greater than normal." The "circumstances" listed by Kennedy are:

1) Groups of people 15 to 24 years of age;

2) In public places;

3) With strangers;

4) With alcohol or drugs present;

5) With inadequate supervision.

Kennedy also opined that the risk of deadly violence was foreseeable to Metro because it provided a rental monitor and retained the authority to terminate the event for violations of the alcohol policy. This "retention of authority," according to Kennedy, is a "recognition" on the part of Metro that there is the possibility of a "loss of control" at such events.

PREMISES LIABILITY

The Wilberts contend that Metro is liable because Wilbert was a business invitee and Metro was the owner or occupier of business premises. Metro argues that Wilbert was not its business invitee, but the invitee of Metro's renter. For purposes of this discussion, we assume, without deciding, that Wilbert was the business invitee of Metro.

In *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 943 P.2d 286 (1997), the Supreme Court held that a business owner has a special relationship with his or her business invitees, creating a duty to protect those invitees from criminal conduct by third parties. But the duty extends only to harm that is reasonably foreseeable. *Nivens*, 133 Wn.2d at 205.

Ordinarily, foreseeability is a jury question and a criminal act can be held unforeseeable as a matter of law only "if the occurrence is so highly extraordinary or improbable as to be wholly beyond the range of expectability." *Johnson v. State*, 77 Wn. App. 934, 942, 894 P.2d 1366, *review denied*, 127 Wn.2d 1020 (1995). But the "pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated." *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953). Thus, a school district may be liable for the rape of a student by other students in a darkened, unsupervised room because acts of indecency in the room were foresee-

able, even though the specific act of rape was not. *McLeod*, 42 Wn.2d at 323-24.

■ The Washington cases analyzing foreseeability have focused upon the history of violence known to the defendant. Where no evidence is presented that the defendant knew of the dangerous propensities of the individual responsible for the crime, and there is no history of such crimes occurring on the premises, the courts have held the criminal conduct unforeseeable as a matter of law. *See Nivens*, 133 Wn.2d 192; *Christen v. Lee*, 113 Wn.2d 479, 496, 780 P.2d 1307 (1989); *Shelby v. Keck*, 85 Wn.2d 911, 541 P.2d 365 (1975); *Jones v. Leon*, 3 Wn. App. 916, 926, 478 P.2d 778 (1970). On the other hand, where there is a history of similar violence on the premises or the defendant knew of the dangerous propensities of the individual responsible, foreseeability has been established, at least sufficient to create a jury question. *Johnson*, 77 Wn. App. at 943 (evidence of "numerous crimes" taking place on campus makes rape sufficiently foreseeable to take premises liability case to jury); *J.N. v. Bellingham Sch. Dist. No. 501*, 74 Wn. App. 49, 59, 871 P.2d 1106 (1994) (school district's knowledge of student's "assaultive propensity" sufficient to defeat summary judgment); *Niece v. Elmview Group Home*, 131 Wn.2d 39, 50-51, 929 P.2d 420 (1997) (prior sexual assaults by employee at group home contribute to foreseeability sufficient to take case to jury); *Cox v. Keg Restaurants U.S., Inc.*, 86 Wn. App. 239, 935 P.2d 1377, *review denied*, 133 Wn.2d 1012 (1997) (premises liability verdict for assault affirmed where restaurant had notice of violent and intoxicated behavior by patron).

Here, the Wilberts offered no evidence that Metro knew of the violent propensities of the assailant or that there had been similarly violent episodes at the Center in the past. Instead, the Wilberts offered the wedding party affidavits. These showed that there were a number of unruly, aggressive, vulgar young people at the dance and that fights occurred as early as 10:30 P.M. But the affidavits did not describe when the fights were, how long they lasted, how

many people were involved, whether they occurred in the presence of Serrano, whether the victim or assailants were involved, or, most importantly, whether any of the fights involved the use or threatened use of deadly force. Evidence of antisocial, unruly, or even hostile behavior is generally insufficient to establish that a defendant with a supervisory duty should reasonably have anticipated a more serious misdeed. *J.N.*, 74 Wn. App. at 60. Thus, the wedding party affidavits were insufficient to establish that Metro should, on the basis of the events earlier in the evening, have anticipated a fatal assault with a deadly weapon.

Nor does the Kennedy declaration help the Wilberts. Kennedy does not supply the prerequisites of foreseeability required by the Washington cases: specific evidence that the defendant knew of the dangerous propensities of the individual assailant or previous acts of similar violence on the premises. *See, e.g., Christen v. Lee*, 113 Wn.2d 479, 780 P.2d 1307 (1989), and cases cited above.

In addition, Kennedy spoke of an increase in the risk of personal victimization "three to four times greater than normal." But without knowing what the baseline risk is, the statistic is not helpful.

We hold that the criminal event in question was not foreseeable as a matter of law. Therefore, Metro owed Wilbert no duty of prevention.

TAVERN KEEPER PREMISES LIABILITY

■ The Wilberts contend that Metro's alcohol policy puts it in the same position as a tavern keeper for purposes of premises liability. Assuming, without deciding, that this is so, the same foreseeability problem arises. A tavern keeper is liable to his patrons for the criminal conduct of others only if the harm is foreseeable. *Christen*, 113 Wn.2d at 491. As we have seen, the criminal conduct here was not foreseeable as a matter of law.

VOLUNTARY ASSUMPTION OF A DUTY

The Wilberts next contend that Metro affirmatively

undertook a duty to enforce its alcohol policy, and that its failure to cancel the event because of violations of the alcohol policy proximately caused Wilbert's death. The Wilberts rely upon *Roth v. Kay*, 35 Wn. App. 1, 4, 664 P.2d 1299 (1983), which held that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." The Wilberts have cited numerous violations of the alcohol policy which, for the purposes of summary judgment, we accept as true. These included (1) late application by Ghetto Down for its banquet permit, (2) public advertising of the event, (3) opening the event to the public, (4) selling alcohol by Ghetto to patrons, (5) consuming alcohol outside the room rented, (6) consuming alcohol by minors, and (7) allowing more patrons (300) than estimated in the application (150). And the alcohol policy clearly gave Metro the right to cancel the event "immediately" upon discovery of a violation of the policy.

██ But the Wilberts have failed to show that Metro's violation of its alcohol policy proximately caused the outbreak of deadly violence. The record contains no evidence that either the victim or the assailants were drinking or otherwise violating Metro's alcohol policy. The record also fails to show that the earlier fights, the escalation of fighting or the final fight were caused by any violation of Metro's alcohol policy. The Wilberts argue simply that if Metro had closed the facility earlier, the deadly assault would not have occurred. While this may be sufficient to establish cause in fact, proximate cause requires in addition a showing of legal causation. *Moore v. Mayfair Tavern, Inc.*, 75 Wn.2d 401, 405, 451 P.2d 669 (1969) (proximate cause requires foreseeability in addition to cause in fact).

We conclude that the Wilberts failed to produce sufficient evidence of foreseeability, and that any violations of Metro's alcohol policy were not the proximate cause of Wilbert's death. Thus, we affirm.

BRIDGEWATER, A.C.J., and MORGAN, J., concur.

312

After modification, further reconsideration denied April 24, 1998.