IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STAR CRILL, | ) | |
| | ) | No. 31912-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WRBF, Inc. d/b/a DENNY'S | ) | UNPUBLISHED OPINION |
| RESTAURANT, DEBRA FOUTS and | ) | |
| JACK FOUTS, individually and as a | ) | |
| marital community; JERRY FOUTS, and | ) | |
| JANE DOE FOUTS, individually and as a | ) | |
| marital community; DENNY'S INC., a | ) | |
| California Corporation; JACKIE D. | ) | |
| LEGERE, Jr.; AUSTIN GARNER, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. —

*On a clear day, we can foresee forever.* Paraphrase of *Thing v. La Chusa*, 48 Cal. 3d 644, 668, 771 P.2d 814, 257 Cal. Rptr. 865 (1989).

We address a recurring issue: when is a business liable for injuries caused by one customer assaulting another customer? Star Crill sues a Denny's Restaurant after another diner, Austin Garner, assaulted her in the restaurant. The trial court dismissed Crill's

claim on summary judgment, while ruling that a lack of similar prior incidents rendered the assault unforeseeable as a matter of law and thus the restaurant possessed no duty to prevent the attack. We affirm. In affirming, we review the Washington Supreme Court's recent decision of *McKown v. Simon Property Group, Inc.*, 182 Wn.2d 752, 344 P.3d 661 (2015).

## FACTS

Because Star Crill appeals the trial court's grant of summary judgment in favor of the Denny's restaurant, we write the facts in a light most favorable to her. At 2:08 a.m. on Saturday morning, January 3, 2009, an intoxicated Austin Garner struck Star Crill inside a Denny's Restaurant, owned by WRBF, Inc., on Argonne Road, in Spokane Valley. Crill sued WRBF, Denny's, Inc., Austin Garner, and Garner's companion Jackie Legere. Denny's, Inc., is the franchisor of ubiquitous Denny's restaurants. WRBF is the owner of the Argonne Road Denny's restaurant and other Denny's in the Spokane area. The only defendant on appeal is WRBF and we will refer to it as the Argonne Denny's or Denny's. Crill sues the Argonne Denny's for negligence in failing to prevent the misbehavior of Garner.

We begin with the practices of the Argonne Denny's restaurant. The Argonne restaurant is open twenty-four hours a day. Denny's home office typically requires that its franchisees remain open twenty-four hours a day, seven days a week.

On weekends, after nearby bars cease serving alcohol at 2:00 a.m., the Argonne Denny's serves a gaggle of drunk customers. Denny's server Mary Winter testified: "Where a bar closes, they close down for the night and everybody leaves, either they go home or usually a lot of people when they're drinking, they need food. Either they go home and eat or they come to the restaurant and eat. So they call it the bar crowd because it's after the bar closes." Clerk's Papers (CP) at 329. The Argonne Denny's does not sell alcohol.

Fred Del Marva, a security expert for Star Crill, declared that "[i]t is well known throughout the Denny's 'system' that argumentative and assaultive conduct is a common occurrence and highly foreseeable when soliciting an after-bar clientele between the hours of 11:00 p.m. and 4:00 a.m." CP at 215. Denny's manager Larry Lovins testified to the obvious that "a person that's more intoxicated probably is more likely to cause problems than a person that's not." CP at 405. Denny's server Debbie Fuentes described the bar rush as "[a] lot of drunk, obnoxious people" who might "turn on you in a heartbeat." CP at 160. According to Fuentes, the majority of patrons during these early morning hours are intoxicated.

The Argonne Denny's General Manager Don Wold testified: "While we are open 24 hours, we seldom have experienced any issues of criminal conduct by patrons. Disruptive guests are usually limited to people that are either unhappy with service, or do not pay their bill." CP at 62. Manager Larry Lovins, who has worked at the Argonne

3

Denny's for eleven years, testified: "We generally at Denny's didn't have any issues. The location that we're at is a pretty calm restaurant. I've never had any situations where I had, you know, somebody beat up or anything like that." CP at 398. Lovins noted a shoving incident that occurred in a Shari's parking lot, and commented that the bar rush for the Denny's on North Division "was kind of tough at times." CP at 401. Argonne Denny's manager Jason Liberg saw the occasional argument, but never had "one on one of [his] shifts that resulted in actual physical violence." CP at 348. Server Debbie Fuentes mentioned a "fight" that occurred in the Argonne Denny's parking lot.

The Argonne Denny's maintains no written procedure regarding managing troublesome patrons. The restaurant, however, trains its staff on handling disruptive guests, which "generally include any patron that is being loud, unmanageable, aggressive with any of his own party, aggressive with anybody else in the restaurant, including other patrons or staff, complaining loudly, or any variety of circumstances that would generally disrupt other patrons' enjoyment." CP at 61. The restaurant instructs its staff to exercise three steps: first, ask the troublesome guest to calm down and cease the disorderly activity; second, if the disruption persists, ask the patron to leave; and last, if the disorderly guest refuses to leave, phone police. This same approach applies to drunk customers. The Argonne Denny's instructs its staff not to intervene physically with a difficult guest.

4

The Argonne Denny's maintains a log of significant events in order to foster institutional knowledge. Argonne Denny's General Manager Don Wold declared that he reviewed the log covering September 2008 to January 2009 and discovered no incidents of assaults or fights at the restaurant during this window of time.

Service coordinators do not have access to the Argonne Denny's significant events logbook. Nevertheless, service coordinators sometimes substitute as managers. The restaurant cross trains its service coordinators in every job, including cook, hostess, and server to better understand the restaurant's operation.

During a weekend bar rush, the Argonne Denny's typically serves thirty to forty customers between 1:30 and 3:30 a.m. On Friday night, January 2, 2009, two to three servers, a dishwasher who doubled as a host, and a cook that doubled as a security guard worked at the restaurant. No manager served only as manager. Security expert Fred Del Marva testified that, with the size of the premises, five or six servers, one cook, one busboy, one dishwasher, a host/cashier, and a manager that does nothing but manage should have been present.

On Friday, January 2, 2009, the scheduled manager's house flooded, and she could not work that night. After working a day shift, server Mary Winter returned that evening to work as acting manager. Winter worked for various Denny's restaurants for sixteen to seventeen years as a server, bar tender, and assistant manager. Winter was trained to handle disruptive guests using the three-step approach described above.

5

We have established the context in which Austin Garner assaulted Star Crill. We now describe the events leading to the attack.

On Friday, January 2, 2009, Austin Garner drank alcohol at Good Tymes Bar and Grill with friends. During his deposition, Garner could not remember the number of drinks he consumed at Good Tymes, but speculated he imbibed one to six drinks. From Good Tymes, Austin Garner, Jackie Legere, and two friends moved, during the early morning hours of January 3, to the Argonne Denny's. Garner and Legere were drunk. No Denny's employee asked Austin Garner and his friends whether they had been drinking.

A server at the Argonne Denny's sat Garner, Legere, and friends in a booth and promised to bring menus. Star Crill and friend Mario Diaz dined in the booth adjacent and behind the group. As they ate, Crill and Diaz discussed Diaz's family, his career choices, and politics. Jackie Legere turned toward the adjacent booth and told Crill and Diaz to shut up. Crill noticed Legere to be drunk, because the latter slurred his speech and his arm frequently fell from its resting ledge. Crill and Diaz heard Legere's comment but did not know if Legere addressed them.

A server, Charlotte Stemple, informed acting manager Mary Winter that: "there may be a problem with some patrons seated in booths along the windows." CP at 65. Winter declared:

Because those booths were located behind a server island, I could not see the patrons, so I immediately grabbed some water and coffee and went to observe the situation. There were no issues or problems occurring at that time, and I asked a woman seated at one table with one other gentleman (who I later learned was named Star Crill, the plaintiff in this suit) if she wanted some water, and asked her if everything was OK, and she said "yes"—she did not report any problems to me.

CP at 65. Winter took water and coffee to the tables because she did not wish the customers at Austin Garner's table to believe she targeted them. According to Mary Winter, she spoke with Star Crill and then approached Garner's table. Crill denies that any Denny's employee spoke to her. Winter then went to the entrance of the restaurant to seat some customers.

Jackie Legere soon repeated louder his request to Star Crill and Mario Diaz to shut up. Diaz responded: "'Turn around and mind your own business.'" CP at 30. Three to four minutes later, Legere replied in an even louder tone, "'Hey, I said shut the fuck up.'" CP at 30.

Mary Winter heard loud voices at the two tables. Winter approached Jackie Legere and Austin Garner's table and asked if there was a problem. The three to four men said there was no problem. Winter directed the covey of men to hush or leave. They quieted. According to Winter, she asked Star Crill again if she was okay, and Crill stated there was no problem. Crill denies Winter speaking to her. Someone took food orders for those at Garner's table.

After Mary Winter left the area of the two tables, the situation escalated. Star Crill

7

stood but instructed Mario Diaz to remain seated. Crill told Diaz: "It's not worth it. Don't get in a fight. Don't waste your time on these guys. They are just drunk." CP at 36. Austin Garner stood. Crill looked around in hope and expectation that a Denny's employee would intervene. Charlotte Stemple, a server, stood at the service station across the aisle from the tables. Stemple gazed at Crill and walked to the kitchen to retrieve Mary Winter. With no Denny's employee in sight, Austin Garner hit Star Crill in the back of her head or her neck.

According to Austin Garner, he never struck Star Crill. Garner testified that Crill stood and fell into him because of her drunken state. He then brushed her pony tail with his hand, because the tail grazed his face. In her complaint, Star Crill alleges that Garner "unintentionally made bodily contact" with her. Crill sues Garner for negligence and recklessness, but not for assault.

Mary Winter returned to the tables after the assault. Winter testified:

> Q. And that night you were the manager; is that right?
> A. Yes.
> Q. And so, when Charlotte Stemple—am I right in assuming that when Charlotte thought there was a disruptive guest she came and notified you?
> A. She never said there was a disruptive guest.
> Q. So who was the person that determined that they were a disruptive guest?
> A. It was myself after I made—it was a third time I went through and then they was being disruptive. The second time when I walked over there they quieted down. They did exactly what I asked them to do. And they were okay.

8

Q. On the third time is when you determined they were disruptive guests?

A. And I asked them to leave and I was calling the cops.

CP at 331.

When Mary Winter returned to the booths, she saw and heard one man standing and talking loudly to the couple sitting at the adjoining booth. Austin Garner, Jackie Legere, and their two friends surrounded Winter and yelled at her. Winter squeezed through them, demanded the four leave, and went to call the police. While phoning police, Winter learned of the assault on Crill.

The responding law enforcement officer felt a knot forming on the back of Star Crill's head. According to the officer's report, multiple bystanders witnessed Austin Garner strike Star Crill. The officer smelled alcohol on Austin Garner and observed Garner acting intoxicated. Garner bragged about knowing attorneys who would successfully procure the dismissal of any criminal charges.

## PROCEDURE

After Star Crill sued and on completion of discovery, Argonne Denny's moved for summary judgment. It argued that it had no duty to protect against Austin Garner's criminal conduct because no incidents of that exact nature previously occurred so as to render Garner's conduct foreseeable. Denny's also argued that its staff's response to Garner's conduct was reasonable as a matter of law. In response to the summary judgment motion, Star Crill argued that the incident and her resultant injuries occurred

due to Denny's failure to maintain safety and security procedures for its customers. She

contended that Austin Garner's attack was foreseeable.

In response to the summary judgment motion, Star Crill relied, in part, on a

December 3, 2007, Nation's Restaurant News article titled *Restaurants open themselves*

*up to greater risks with later hours.* Crill's counsel attached the article to his declaration.

The article recounts recent shootings and domestic violence incidents that occurred at

restaurants nationwide. The article laments:

> While criminals prey on industry operations in the daytime, too,
> security experts note that the foodservice industry's high-turnover rate,
> which can result in poor employee training, and security systems focused
> more on preventing vandalism than robbery or assaults, are contributing to
> the spate of late-night crimes.

CP at 235.

The Nation's Restaurant News article mentions injuries and deaths to guests, but

focuses on employee injuries and deaths. The article declares that injuries and deaths

come most often from robberies or angry ex-spouses and jilted lovers. The article relates

the tragic death of an Orlando Denny's restaurant employee who was stabbed to death at

work by her estranged husband. The article quotes Mike Jank, vice president of risk

management for Denny's customer stores:

> I just hope operators realize they are going to have problems if they
> don't keep in mind that the security issues you have in the daytime are far
> different at night.

CP at 232. Based in part on this article, Star Crill's expert witness Fred Del Marva

10

opined that "Denny's nationwide is known for late hour criminal activity such as shootings, stabbings, murders and assaults," and the Argonne Denny's failed to respond to this national trend. CP at 444.

The Nation's Restaurant News article does not mention alcohol or the bar rush phenomenon. The article does not warn of customers assaulting other customers.

Argonne Denny's moved to strike the Nation's Restaurant News article as irrelevant and hearsay. The trial court struck the article as hearsay.

Star Crill's expert witness Fred Del Marva submitted a declaration opposing Denny's summary judgment motion. In the declaration, Del Marva testified to his opinions regarding the standard of care for security in business premises based on his expertise and review of the circumstances of the assault on Crill. According to Del Marva, operators of Denny's restaurants know that argumentative and assaultive conduct is a common occurrence and highly foreseeable when soliciting an after-bar clientele between the hours of 11:00 p.m. and 4:00 a.m. In asserting this fact, Del Marva relied on a presentation given to the Denny's Board of Directors on this subject in 2007 and the December 3, 2007, restaurant industry journal Nation's Restaurant News.

Fred Del Marva also testified that Denny's restaurants target the after-bar clientele. In turn, these patrons have a high propensity for argumentative and disruptive behavior. This behavior can turn quickly into assaultive behavior or behavior that can lead to injuries.

11

The daytime clientele at Denny's is a completely different crowd and will portray different behaviors from nighttime clientele, according to Fred Del Marva. The daytime atmosphere at Denny's is a completely different scene than the atmosphere between the hours of 11:00 p.m. and 4:00 a.m. For this reason, a Denny's restaurant needs specific policies and procedures for a host or hostess to identify intoxicated customers at the time of entry. Training, policies, and procedures which prevent intoxicated individuals from entering the premises substantially reduce the likelihood of disruptive events, which may lead to assaults or injuries of other patrons. Del Marva posits that a Denny's must, without exception, have a specially trained manager who is experienced in dealing with the 11:00 p.m. to 4:00 a.m. clientele on shift between those hours.

Fred Del Marva faults the Argonne Denny's for allowing a server to perform the dual task of restaurant manager during the grave yard shift on January 2 to 3, 2009. Del Marva also blames the restaurant for allowing Mary Winters to work as the manager when she had no training to manage the restaurant during the night and early morning. Winters' inexperience and divided duties increased the risks from intoxicated patrons. A properly trained manager and one whose attention was not diverted by also serving would have smelled alcohol on Austin Garner as he entered the restaurant. The manager would have either refused to seat Garner or removed him at the first sign of boisterousness. The Argonne restaurant had the least experienced manager during a time that the best

12

manager should have been on duty. During the early morning hours of January 3, the

Argonne Denny's improperly allowed any employee to seat customers.

Fred Del Marva concluded in his declaration:

> A restaurant which is open twenty four hours cannot operate on blind disregard of the need for extra security procedures and policies during late-night/early-morning hours. Based upon the depositions, there has been no active intent to discover what kinds of risks should be guarded against and what kinds of risks are being found in the industry. This creates a problem where management is not even evaluating the need for appropriate and reasonable security measures. This type of approach keeps management from evaluating and reasonably responding to changing security concerns. This is essentially, ignoring the problem and hoping customers don't get hurt. This is not accepted in the restaurant or hospitality industry as a responsible course of conduct.
>
> Denny's on Argonne could have taken several measures prior to the incident of January 3, 2009 to prevent injuries to its customers. These measures include working digital or video recordings, which allow the management to review interactions of employees with potentially disruptive customers, so that management can follow up with better training. There should be mandatory reporting of disruptive events, to allow for follow-up and training of employees, specifically the host/hostess. Having a security expert do an evaluation and security plan for the premises, to better inform the management of what procedures and or policies should be in place for the safety of the customers and staff. And specifically, at a minimum, a policy requiring that an experienced and well trained manager be onsite during the hours between 11:00 p.m. and 4:00 a.m. along with a host/hostess who is properly trained in identifying intoxicated persons and understands his/her role in preventing the seating of those customers.

CP at 219-20.

The trial court granted the Argonne Denny's summary judgment. In a written

decision, the trial court observed that restaurants have a duty to use reasonable care to

prevent harm to patrons by foreseeable criminal conduct. Nevertheless, according to the

13

trial court, Washington decisions hold that past criminal behavior on a premises renders future crimes reasonably foreseeable only if such future crimes are of the exact nature as the past criminal behavior. The trial court noted that no assaults previously occurred inside the Argonne Denny's. The trial court reasoned that Star Crill's offer of industry-wide standards did not create an issue of material fact.

Star Crill moved the trial court to reconsider. Crill argued that foreseeability does not require previous incidents of the "exact nature." CP at 286. Crill also argued that the Argonne Denny's foresaw the assault as imminent, intervened, but did so negligently. Finally, Crill maintained that Denny's flawed policy created a question of fact as to the reasonableness of the restaurant staff's response to the behavior of Jackie Legere and Austin Garner. The trial court denied reconsideration.

## LAW AND ANALYSIS

On appeal, Star Crill contends that: (1) the trial court erred when it struck the Nation's Restaurant News article, (2) a genuine issue of material fact exists as to whether Austin Garner's assault of Crill was foreseeable and as to whether the Argonne Denny's breached its duty to her, and (3) the Argonne Denny's assumed a duty to protect Crill, which it then performed negligently. We address these assignments of error in order.

*Issue 1: Did the trial court err when striking as evidence the Nation's Restaurant News article?*

*Answer 1: We need not and do not address this question.*

14

Star Crill contends the trial court erred for two reasons when it struck the Nation's Restaurant News article. First, the article is not hearsay because it was offered to show knowledge of the Argonne Denny's of late night attacks. Second, even if hearsay, Fred Del Marva could rely on the article as an expert witness.

The Nation's Restaurant News article is cumulative of the testimony of Crill's expert witness, Fred Del Marva. Thus, the article adds nothing of significance to our analysis. We decline to resolve this assignment of error since its resolution does not impact our decision on the merits. Principles of judicial restraint dictate that if resolution of another issue effectively disposes of a case, we should resolve the case on that basis without reaching the first issue presented. *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007); *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55, 68, 1 P.3d 1167 (2000).

*Issue 2: Did the Argonne Denny's hold a duty to protect Star Crill from an attack by Austin Garner? Stated differently, was the attack on Crill foreseeable under negligence law?*

*Answer 2: No.*

We note an anomaly in the pleadings of Star Crill. Crill contends in her complaint that Austin Garner unintentionally harmed her. She alleges negligent conduct, not an assault, by Garner. Despite her complaint's allegation of negligence, Crill asked the trial court and asks this court to impose a duty on Argonne Denny's to protect her from an

15

assault or intentional conduct by another patron. The law generally imposes the same duty on a business in protecting a customer from acts of another customer regardless of whether the acts are careless or intentional. *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 207, 943 P.2d 286 (1997); RESTATEMENT (SECOND) OF TORTS § 344 (1965). Therefore, we consider this anomaly irrelevant. Since the parties assume that Austin Garner assaulted Star Crill and rely on assault decisions, we do too.

We must repeat the familiar rules of summary judgment jurisprudence. This court reviews a summary judgment order de novo, engaging in the same inquiry as the trial court. *Highline Sch. Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976); *Mahoney v. Shinpoch*, 107 Wn.2d 679, 683, 732 P.2d 510 (1987). Summary judgment is proper if the records on file with the trial court show "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). This court, like the trial court, construes all evidence and reasonable inferences in the light most favorable to Star Crill, as the nonmoving party. *Barber v. Bankers Life & Cas. Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). A court may grant summary judgment if the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

We later write that the dispositive question on appeal is whether the Argonne

Denny's held a legal duty to protect Star Crill from the blow to her head. In turn, the question of duty depends on the reasonable foreseeability of the attack. Foreseeability as a question of whether a duty is owed is ultimately for the court to decide. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 762-64 (2015). The existence of a legal duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent. *Christensen v. Royal Sch. Dist. No. 160*, 156 Wn.2d 62, 67, 124 P.3d 283 (2005); *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001); *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 474-75, 951 P.2d 749 (1998); *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621 (1994).

Isolating the key facts assists in our analysis. Crill underscores Austin Garner's crowd being boisterous and Mary Winter's previous request to the table to quieten. Austin Garner's companion, Jackie Legere, demanded that Crill and her companion "shut the fuck up." CP at 30. No evidence suggests that Austin Garner spoke any words to Star Crill or her companion before the assault.

Star Crill highlights the nature of Denny's restaurants business, which includes serving intoxicated patrons who exit taverns late at night or in the early morning to eat at Denny's. According to Crill, an experienced manager trained to deal with drunk customers should have been present at the Argonne Denny's during the morning of January 3. Mary Winter was an assistant manager who also worked as a server that morning. Also according to Crill, the manager should have smelled alcohol on Garner

17

and known him to be intoxicated. The manager should have never seated Garner or escorted him from the premises before his striking of Crill. At the same time, Crill must concede that neither Austin Garner nor any of his companions threatened to hurt anyone. Garner had no record of assaults or any known history at the Argonne Denny's.

The Argonne Denny's restaurant had never earlier encountered an assault inside the premises. An altercation occurred in the parking lot of the restaurant, but we know nothing about the details of the confrontation.

Star Crill challenges the credibility of Argonne Denny's witnesses who claim the business suffered no earlier assaults by a patron on an employee or another customer. Star Crill also suggests that other Denny's restaurants owned by WBRF, Inc., in the Spokane area, may have encountered assaults therein. Nevertheless, Crill provides no affirmative evidence of any earlier attacks at the Argonne location, let alone any other Spokane location.

Even though Austin Garner's conduct may have been intentional, Crill sues the Argonne Denny's in negligence. The essential elements of an action for negligence are: (1) the existence of a duty owed to the complaining party, (2) a breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury. *Christen v. Lee*, 113 Wn.2d 479, 488, 780 P.2d 1307 (1989). Not every negligent act leads to legal consequences. A defendant is not held at fault for hazards not expected to result from his or her behavior or inaction. When determining if a defendant owed any duty to the

18

plaintiff, courts consider whether the risk that caused plaintiff's injury or the harm was reasonably foreseeable to the defendant. "Reasonable foreseeability" is the dispositive locution for this appeal.

"Foreseeability" is a factor attached to negligence's first element of duty. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 762-64 (2015); *Maltman v. Sauer*, 84 Wn.2d 975, 980, 530 P.2d 254 (1975). The hazard that caused or assisted in bringing about the injury to plaintiff must be among the hazards to be perceived reasonably and with respect to which defendant's conduct was negligent. *Maltman v. Sauer*, 84 Wn.2d at 980; *Rikstad v. Holmberg*, 76 Wn.2d 265, 268, 456 P.2d 355 (1969).

A defendant has no duty to prevent a criminal attack by a third person on another, even if the defendant reasonably anticipates the attack, unless a special relationship exists between the victim and the defendant. Generally, no person has a duty to come to the aid of a stranger or protect others from the criminal acts of third persons. *Folsom v. Burger King*, 135 Wn.2d 658, 674, 958 P.2d 301 (1998); *Craig v. Washington Trust Bank*, 94 Wn. App. 820, 826, 976 P.2d 126 (1999).

The parties agree that Star Crill was a business invitee at the Argonne Denny's. A business owner has a special relationship with its business invitees, creating a duty to protect those invitees from criminal conduct by third parties. *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d at 205 (1997). A business invitee is owed a duty of reasonable care for reasonably foreseeable criminal conduct by third persons. *Nivens*, 133 Wn.2d at 205;

19

*Fuentes v. Port of Seattle*, 119 Wn. App. 864, 869-70, 82 P.3d 1175 (2003). No duty arises unless the harm to the invitee is foreseeable. *Nivens*, 133 Wn.2d at 205; *Wilbert v. Metro. Park Dist.*, 90 Wn. App. 304, 308, 950 P.2d 522 (1998).

The use of the word "foreseeability" in the context of imposing a duty is confusing because Washington courts also employ the term after a duty is established to determine the scope of the duty owed. *Schooley v. Pinch's Deli Market*, 134 Wn.2d at 477 (1998). Courts also utilize the concept of "foreseeability" when determining whether any fault on the part of the defendant was a proximate cause of the plaintiff's injuries. *Washburn v. City of Federal Way*, 178 Wn.2d 732, 761, 310 P.3d 1275 (2013).

Despite applying a foreseeability test in a premises liability case, our Supreme Court in its recent decision, *McKown v. Simon Property Group, Inc.*, 182 Wn.2d 752 (2015), questioned the fairness of such a test. Subjecting a merchant to liability solely on the basis of a foreseeability analysis is misbegotten, wrote the court. *McKown*, 182 Wn.2d at 771. Criminal activity is arbitrary, irrational, and unpredictable. Crime is invariably foreseeable everywhere, yet unforeseeable in any specific time and place. Even police, specially trained and equipped to anticipate and prevent crime, cannot universally foil it. Given these realities, it is unjustifiable to make merchants, who have much less experience than the police in dealing with criminal activity and who lack a community deputation to do so, vicariously liable for the criminal acts of third parties.

20

Courts, rather than juries, assessing foreseeability should also be criticized. Judges have no special training in determining when to expect the commission of a crime. Using foreseeability in a flexible, case-by-case analysis creates uncertainty by giving courts the power and method to decide cases without external restraint. *McKown*, 182 Wn.2d at 772 n.8.

Despite any unfairness, we remain tasked with answering whether, during the early morning of January 3, Argonne Denny's should have reasonably anticipated that Austin Garner would strike Star Crill in time to stop the assault. This question begs other questions. Is it probable that a quiet, drunk man, accompanied by a boisterous friend, at a Denny's restaurant in the early morning hours will hit another customer? Do we limit the question to Austin Garner being the attacker or should we ask if Argonne Denny's should have reasonably foreseen any one at the Garner table might hit Star Crill? Does the absence of any earlier assaults inside the restaurant preclude the Argonne Denny's from anticipating a physical attack? Is the character of Denny's restaurants a relevant factor in assessing the risk of an assault?

The test of reasonable foreseeability begs more elementary questions. The law quantifies reasonable probability as more than a fifty percent chance, or a 50.1 percent chance, of being correct. Is reasonable foreseeability a fifty percent chance that an event will occur? Should foreseeability be measured in time rather than in possibility? Is reasonable foreseeability the probability that some event will occur within one day, one

week, or one year? The law provides no answers to these questions and affords no mathematical formulation for determining reasonable foreseeability.

Washington decisions contain many statements and restatements of the foreseeability rule relevant to when a tort duty arises to protect another. Some of these pronouncements use vacuous phrases that sound good on paper but provide little assistance when reviewing concrete situations. Under many of these pronouncements, "reasonable foreseeability" lies in the subjective eyes of the individual foreseer.

A criminal act is "unforeseeable" as a matter of law if the criminal "occurrence is so highly extraordinary or improbable as to be wholly beyond the range of expectability." *Fuentes v. Port of Seattle*, 119 Wn. App. at 868 (2004); *Johnson v. State*, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995). So from "reasonably unforeseeable" we move to the equally murky phrase "highly extraordinary."

The pertinent inquiry is not whether the actual harm was of a particular kind which was expected. *Wilbert v. Metro. Park Dist.*, 90 Wn. App. at 308. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated. *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953). If the damage complained of falls entirely outside the general threat of harm that the plaintiff claims makes a party's conduct negligent, there is no liability. *McLeod v. Grant County Sch. Dist.*, 42 Wn.2d at 321-22; *Fuentes v. Port of Seattle*, 119 Wn. App. at 870. Thus, foreseeability involves a general field of danger, but we may still wonder

what constitutes a general field of danger. This principle might lead to liability on the Argonne Denny's, if foreseeability were otherwise found, for an assault by Austin Garner even though Jackie Legere was the boisterous and harassing one, since there existed a general field of danger of an assault by someone at the adjoining table.

Two principles defining "foreseeability" may conflict. On the one hand, the unusualness of the act that resulted in injury to plaintiff is not the test of foreseeability, but whether the result of the act is within the ambit of the hazards covered by the duty imposed on a defendant. *Rikstad v. Holmberg*, 76 Wn.2d at 269 (1969). Thus, a bop on the head, rather than the typical punch in the face, may not shield one from liability, even though the location of the strike on the victim's body was unforeseeable. On the other hand, the specific act in question, rather than a broad array of possible criminal behavior, must be foreseeable to the business owner from past information. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 769-70 (2015).

More precise rules facilitate resolving this appeal. A business has no per se duty to employ security personnel to protect business invitees. *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d at 205-06 (1997); *Raider v. Greyhound Lines, Inc.*, 94 Wn. App. 816, 819, 975 P.2d 518 (1999). A rule of particular importance in this appeal is that evidence of antisocial, unruly, or even hostile behavior is generally insufficient to establish that a defendant with a supervisory duty should reasonably anticipate a more serious misdeed. *Moore v. Mayfair Tavern, Inc.*, 75 Wn.2d 401, 405-06, 451 P.2d 669 (1969); *J.N. v.*

23

*Bellingham Sch. Dist. No. 501*, 74 Wn. App. 49, 60, 871 P.2d 1106 (1994).

Certain factors may play a critical role in determining reasonable foreseeability of a criminal deed. These factors include: (1) the imminence of the attack, (2) the known criminal propensities of the attacker, (3) the neighborhood of the business, (4) the character of the defendant's business, and (5) the history of the business. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 769-70 (2015). Analyzing each case with these factors in mind assists in an organized and intelligent resolution of cases.

### Imminence of Attack

Under one version of the foreseeability test, a "business owes a duty to its invitees to protect them from imminent criminal harm and reasonably foreseeable criminal conduct by third persons." *Nivens*, 133 Wn.2d at 205 (1997). This rule suggests that the injury need not be the result of reasonably foreseeable criminal conduct if the criminal harm is imminent. In the recent Supreme Court decision, *McKown v. Simon Property Group, Inc.*, 182 Wn.2d at 769-70, the court noted that comment f, of *Restatement of Torts* § 344, recognizes a duty to protect when the landowner knows or has reason to know of immediate or imminent harm. But no Washington decision discusses liability based on "imminent criminal harm." Perhaps the imminence of the attack should render it reasonably foreseeable.

Star Crill may include the purported imminence of Austin Garner's assault as a factor in her calculus of foreseeability. She does not rely exclusively on this factor,

24

however. We are unable to find the assault as imminent, however. A companion's rudeness and obscene words does not qualify one's sudden and irrational assault, even if one is intoxicated, as predictable. Under the law, Jackie Legere's comments did not portend an assault by Austin Garner.

A parallel persuasive decision is *Veytsman v. New York Palace, Inc.*, 170 Md. App. 104, 906 A.2d 1028 (2006). Edward and Tatyana Veytsman ate dinner late one night at Baltimore's New York Palace. The restaurant also hosted a Ukrainian wedding reception that night, during which reception Ukrainian vodka flowed for more than six hours. When leaving the restaurant, several men in the wedding party assaulted the couple. The Veytsmans sued the restaurant and alleged that intoxication of the wedding party guests put the restaurant on notice that violence might occur. The Maryland appellate court affirmed summary judgment dismissal of the suit. Although the attackers engaged in an angry discussion, the restaurant was not on notice that the men endangered others or that others required "protection" from them.

In *Boone v. Martinez*, 567 N.W.2d 508 (Minn. 1997), a case involving a bar fight, the assailant hit the plaintiff over the head with a beer mug. Witnesses testified that the assailant looked obviously intoxicated and angry. One witness saw the attacker slam his beer on the table. The Minnesota Supreme Court dismissed the suit as a matter of law because the evidence was not sufficient to present the jury with a fact question of whether the bar was aware of an impending attack.

25

A case with the opposite outcome is *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106 (Wyo. 1987). The Wyoming Supreme Court upheld a jury verdict entered for the plaintiff who was assaulted in a bar after the aggressor approached him several times threatening him in a loud and vulgar manner. On one occasion the assailant grabbed the plaintiff's shirt. The court allowed the verdict to stand on the ground that the bar was on notice that the plaintiff was in imminent danger because the assailant was loud and vulgar so as to attract the attention of those in the bar and because people in the bar saw him grab the plaintiff's shirt. Neither of those factors are present in our appeal.

*Mayflower* illustrates the type of evidence needed to show the foreseeability of an imminent attack. Our appeal lacks this evidence. Neither Austin Garner nor Jackie Legere threatened Star Crill. Garner had not touched Crill before the blow.

### Attacker's Criminal History

The facts on this appeal include no criminal history for Austin Garner, let alone the Argonne Denny's possessing knowledge of any felonious history.

### Argonne Denny's History

The Argonne Denny's restaurant had no history of criminal acts therein. Testimony referred, however, to an altercation in the parking lot. Star Crill highlights this altercation.

Our Supreme Court, in *McKown v. Simon Property Group, Inc.*, 182 Wn.2d at 757 (2015), recently addressed how similar in nature a previous attack must be to establish

26

reasonable foreseeability of a later assault. Dominick Maldonado shot and injured Brendan McKown and six others in the Tacoma Mall, which Simon Property Group owned. McKown produced evidence of multiple prior shootings and other incidents involving guns occurring at the Tacoma Mall. All of these incidents occurred in the Tacoma Mall's parking lot except one, which occurred in the lobby of the Tacoma Mall's movie theater. The federal district court dismissed McKown's negligence claim against Simon Property Group for failure to submit competent evidence of similar random acts of indiscriminate shootings on Simon's premises. On appeal to the Ninth Circuit Court of Appeals, the circuit court certified questions for the Washington Supreme Court to answer concerning state law.

According to the *McKown* court, in order to establish a genuine issue of material fact concerning a landowner's obligation to protect business invitees from third party criminal conduct under the prior similar incidents test, a plaintiff must generally show a history of prior similar incidents on the business premises within the prior experience of the possessor of the land. The prior acts of violence on the business premises must have been sufficiently similar in nature and location to the criminal act that injured the plaintiff, sufficiently close in time to the act in question, and sufficiently numerous to have put the business on notice that such an act was likely to occur. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 757.

The *McKown* court did not address whether the prior acts asserted by Brendan McKown met the "similar incidents" test. Since the case came before the court on certified questions from a federal court, the Supreme Court did not need to resolve the merits of the suit.

Server Debbie Fuentes mentioned a "fight" that occurred in the Argonne Denny's parking lot. CP at 166. Even if the "fight" Debbie Fuentes referred to was physical, the record contains nothing to indicate the altercation began inside the restaurant or involved the bar rush crowd. We lack the details to determine if this prior incident was similar. Thus, we conclude that Star Crill did not produce evidence of prior acts of violence sufficiently similar in nature and location, sufficiently close in time, or sufficiently numerous to put Denny's on notice.

In *Wilbert v. Metropolitan Park District*, 90 Wn. App. at 308 (1998), the Metropolitan Park District (Metro) rented space to Ghetto Down Productions to perform a private dance. During the dance, two assailants shot and killed Derrick Wilbert. This court noted that Washington cases analyzing foreseeability focus on the history of violence known to the defendant. Evidence of multiple fights earlier that night and the congregation of "unruly, aggressive, vulgar young people at the dance" was insufficient to create a jury question, and the court thus ruled Wilbert's murder unforeseeable as a matter of law on summary judgment. *Wilbert*, 90 Wn. App. at 309.

28

Derrick Wilbert's family relied on Daniel Kennedy, an expert in security and crime prevention practices, who testified that the deadly event in question was foreseeable. Kennedy based this conclusion on the allegedly well-established theory of criminal victimization called the Lifestyle-Exposure Theory. This theory states that certain circumstances increase the risk of an assault by three to four times. The circumstances listed by Kennedy were groups of people 15 to 24 years of age in public places with strangers and with alcohol or drugs present and with inadequate supervision. Kennedy also opined that the risk of deadly violence was foreseeable to Metro because it provided a rental monitor and retained the authority to terminate the event for violations of the alcohol policy. This retention of authority, according to Kennedy, was a recognition on the part of Metro that there is the possibility of a loss of control at such events. This court rejected Kennedy's testimony since it conflicted with Washington law of foreseeability. We similarly reject the testimony of Fred Del Marva, Star Crill's expert, that the Argonne Denny's should have anticipated Austin Garner's behavior.

### Neighborhood of Business

The neighborhood of the Argonne Denny's lacks any reputation or history as a high crime area. Also, as a policy matter, our Supreme Court rejected the idea that location of the premises in an urban area with a high incidence of crime favors imposing a duty. *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 236, 802 P.2d 1360 (1991). If the premises are located in an area where criminal assaults often occur,

29

imposition of a duty could result in the departure of businesses from urban core areas, an undesirable result. *Hutchins*, 116 Wn.2d at 236. Perhaps another undesirable result would be to impose liability on a business open late at night to provide intoxicated people a safe haven to regain sobriety. Assuming the restaurant shunned Austin Garner and Garner drove from the premises intoxicated, Garner could have caused greater injury while driving drunk.

## Character of Business

In the case of the character of the business, if the owner should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it and to provide a reasonably sufficient number of servants to afford a reasonable protection. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 769-70 (2015); RESTATEMENT OF TORTS § 344, comment f. In *McKown*, our high court noted that, although it rejected the location of a business within a high-crime urban area as imposing a duty to protect from third party criminal conduct, the court has not yet considered whether the character of a business or another location of a business, standing alone, could invoke such a duty. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d at 769-70.

The *McKown* court did not decide the circumstances under which a duty would arise when the duty is based solely on the business's place or character. 182 Wn.2d at 757. The court left for an appropriate future case any inquiry concerning the

30

circumstances under which the "place or character" of a business can give rise to a duty to protect invitees against third party criminal conduct. *McKown*, 182 Wn.2d at 762. While Brendan McKown argued that consideration of the "place or character" of a business is a distinct, alternative method of establishing reasonable foreseeability of harm, he offered the court no test, criteria, or parameters regarding how "character" was to be established or assessed. He described the Tacoma Mall as a "soft target" whose place or character made the harm reasonably foreseeable. But aside from this bald assertion, he offered no explanation as to how or why the "character" of the mall necessarily made the mass shooting in the case "reasonably foreseeable."

Star Crill presents no decision that supports a ruling that an all-night restaurant or a restaurant that caters to drunk patrons, without a history of attacks, must anticipate criminal behavior and assume special precautions to protect its customers. In *Errico v. Southland Corp.*, 509 N.W.2d 585 (Minn. App. 1993), Juanita Errico made a purchase at an all-night convenience store after midnight. As she returned to her car, three men assaulted her. She sued Southland, alleging that the company owed a duty to provide for the safety and security of its patrons. The appellate court affirmed dismissal of the complaint, despite Errico's contention that such convenience stores are characteristically dangerous places with high risks of violent crime to employees and customers.

31

Star Crill may contend that assaults at any Denny's restaurant in the world could be relevant to placing the Argonne Denny's on notice of the foreseeability of assaults on its premises. Nevertheless, Crill only provides evidence of the death of an Orlando Denny's restaurant employee who was stabbed to death at work by her estranged husband. The nature of Denny's restaurants business likely had no bearing on this death.

Star Crill's expert witness, Fred Del Marva, notes that Mike Jank, vice president of risk management for Denny's customer stores, declared that restaurants must consider that security issues present during the daytime are different from issues at night. Del Marva also opines that "Denny's nationwide is known for late hour criminal activity such as shootings, stabbings, murders and assaults." CP at 444. Del Marva provides no statistics or anecdotal evidence to support this assertion. He details no incident.

Our review of appellate decisions discovered only one reported case involving an attack at a Denny's restaurant. In *Basicker v. Denny's, Inc.*, 704 N.E.2d 1077 (Ind. Ct. App. 1999), restaurant patrons brought a personal injury action against the restaurant for injuries sustained when they were shot and taken hostage during a robbery attempt at the restaurant. The appellate court held that the robbers' attack on the patrons was not foreseeable. We find no similarity between the *Basicker* facts and our case on appeal. A 1999 robbery of an Indianapolis Denny's restaurant does not make predictable a 2009 assault by a patron on another patron at a Spokane Valley Denny's restaurant.

Star Crill emphasizes the fact that the Argonne Denny's had a policy of handling

32

disruptive patrons and thus the restaurant must have had notice that one patron might

assault another patron. We have already concluded that disruptive customers do not

portend an assault. *Moore v. Mayfair Tavern, Inc.*, 75 Wn.2d at 405-06 (1969); *J.N. v.*

*Bellingham Sch. Dist. No. 501*, 74 Wn. App. at 60 (1994); *Veytsman v. New York Palace,*

*Inc.*, 170 Md. App. 104 (2006).

We conclude that, as a matter of law, the Argonne Denny's should not have

reasonably foreseen the attack on Star Crill for several legal reasons. First, evidence of

the antisocial, unruly, or even hostile behavior of Jackie Legere is insufficient to establish

that the Argonne Denny's should have reasonably anticipated a more serious misdeed.

Second, no case has held that drunkenness alone creates a duty to remove one from

business premises. Third, the only history of any fights at Argonne Denny's was an

altercation in the parking lot, about which we have no details. Fourth, Crill's argument

that a manager experienced in handling drunk customers is similar in nature to the

contention that a business must hire a security guard, an argument already rejected by

Washington courts. *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d at 205-06 (1997); *Raider*

*v. Greyhound Lines, Inc.*, 94 Wn. App. at 819 (1999). Fifth, for public policy reasons,

the law should reluctantly impose on a business the duty of police protection for its

patrons.

On appeal, as she did below, Star Crill cites *N.K. v. Corporation of Presiding*

*Bishop of the Church of Jesus Christ of Latter-Day Saints*, 175 Wn. App. 517, 307 P.3d

33

730, *review denied*, 179 Wn.2d 1005 (2013), for the proposition that general trends may give rise to specific foreseeability. This may be true for a duty arising from a special protective relationship, such as the relationship between a child and a church sponsoring a club. In *N.K.*, a former scout who, as a child, had been molested by a volunteer scout leader with a church-sponsored Boy Scout troop brought a negligence action against the church for failing to protect him. Under Washington's current case law, the relationship between a business and its invitee is a special relationship, but not a special protective relationship.

*Issue 3: Should this court entertain Star Crill's argument that Argonne Denny's assumed a higher duty when Mary Winter earlier spoke to Jackie Legere, Austin Garner, and friends?*

*Answer 3: Yes.*

Star Crill also contends that the Argonne Denny's assumed a duty to protect her, which it then performed negligently. The trial court rejected this contention, in response to a motion for reconsideration, as untimely. Crill claims she made this argument at the original summary judgment hearing.

We do not resolve whether Star Crill asserted this additional argument during her initial summary judgment response. By bringing a motion for reconsideration under CR 59, a party may preserve an issue for appeal that is closely related to a position previously asserted and does not depend on new facts. *River House Dev. Inc. v. Integrus*

34

*Architecture, PS*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012). The law provides no guidelines for determining whether a new position is "closely related" to a previous position, but all of Star Crill's contentions bear on the alleged negligence of the Argonne Denny's and the conduct of Mary Winter. The legal argument forwards no new facts. Entertaining this second argument does not prejudice the Argonne Denny's. We address the contention.

*Issue 4: Did Argonne Denny's assume a higher duty when Mary Winter earlier spoke to Jackie Legere, Austin Garner, and friends?*

*Answer 4: No.*

Star Crill cites *Folsom v. Burger King*, 135 Wn.2d at 676 (1998), to support the contention that the Argonne Denny's assumed a duty to protect her when Mary Winter came to the Austin Garner table in order to end the disruption. Crill argues that one of the bases for imposing a duty of care on one who has begun to help a plaintiff in peril is the situation when the defendant misleads the plaintiff into believing that the danger was being addressed.

Star Crill misstates the standard. The *Folsom* court noted:

> Typically, liability for attempting a voluntary rescue has been found when the defendant *makes the plaintiff's situation worse* by: (1) increasing the danger; (2) *misleading the plaintiff into believing the danger had been removed*; or (3) depriving the plaintiff of the possibility of help from other sources.

135 Wn.2d at 676 (emphasis added). Even if Crill could show Winter's conduct misled

her, she presents no facts that Winter's intervention created the harm, made the situation worse, or induced reliance.

CONCLUSION

We affirm the trial court's dismissal of Star Crill's lawsuit on summary judgment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Korsmo, J.

36